165 So. 783

## DILLARD v. STATE.
### 4 Div. 148.

Court of Appeals of Alabama.
Feb. 4, 1936.

Sollie & Sollie, of Ozark, for appellant.

[1] 26 Ala.App. 446.

A. A. Carmichael, Atty. Gen., for the State.

Brief did not reach the Reporter.

BRICKEN, Presiding Judge.

This appellant was put to trial upon an indictment which charged her with the offense of murder in the first degree, in that she unlawfully and with malice aforethought killed Murie Ruffin by shooting him with a gun or pistol, etc.

The record appears regular in all respects, and from the judgment entry it is disclosed that the trial, in the lower court resulted in the conviction of the defendant of manslaughter in the first degree, and her punishment was fixed, by the jury, at imprisonment in the penitentiary for a term of five years.

The evidence is without dispute or conflict to the effect that Ruffin, the deceased, died as a result of a gunshot wound in his groin, and it is likewise without dispute that the defendant had the gun in her hands at the time the fatal shot was fired. There were no eyewitnesses to the killing and the above-stated fact was ascertained from the confession of the defendant, which was obtained from her by one Dr. Pruitt, who appeared to be the principal witness for the state. There were other witnesses who also testified as to a confession of the defendant.

Dr. Pruitt testified that he went to the home of this appellant, saw and examined the wounded man in a back room of the house, and found a gunshot wound in his right groin about the size of a silver dollar; that the place was bleeding; the wound was ragged, and ranged downward and outward.

The confession of the defendant, as testified to by the witnesses in each instance, was to the effect that on the afternoon in question, she and her two daughters, aged 9 and 12, were at her home and all of them were ironing clothes, etc. The two children were in the next room to her, and that the deceased came to her home in the afternoon and entered the room she was in; that he was drinking and raised a "rucus" with her, and he had a knife in his hand and got after her with that; that he tore her dress and scratched her breast, etc. Her alleged confession was in line with and of the same import of her testimony where she stated as follows:

"I have got the waist along with me that was torn that day. This is the front side (Exhibiting the waist). That's the one that was torn there by Murrie Ruffin.

"At this point defendant offered in evidence the garment just referred to and the same is, for purposes of identification, to be marked 'Exhibit 1.'

"As to what happened when Murrie came up there to my house: He came in there, he was drunk, and he said bad language; he said he wanted to talk to me and I asked him what he wanted to talk about, and he asked me—bad language, and I told him to go on, I didn't have no time to fool with him, I had to iron them clothes, and he used bad language, and I asked him, I said, 'You're drinking,' and he used bad language, and I told him to go on and he used bad language again, and he said, 'Is you going to do what I asked you?' And I didn't tell him nothing right then, and I walked on out after that, out of the room into the other room, tracing around, and he come on out of that dining room and come in the room where the children were, and I come out of that room where I was and come in the room where the children were, and I come out of that room where I was and come by him and he grabbed me and tore my dress and started on me with the knife, and I run and he run and I grabbed the gun and told him to get back and he used bad language, and he just come running, and I backed up from where I got the gun up at, and backed up, and he caught hold of the gun, about eight feet from where I got the gun at: I picked up the gun and he caught hold of it and he tussled there and I jerked the the gun loose, and it fired. He was still coming in my direction. After I grabbed the gun I backed up eight feet, and then he grabbed hold of the gun, and I wrung it loose, and he continued to come on me and I fired. * * * After the gun fired he just said he was shot. He moved from where he was standing at the time he was

shot. He moved about five feet, I reckon, and fell. He was right in the kitchen when he fell and he commenced crawling to the dining room. He was in the dining room at the time these other people came."

The foregoing testimony of the defendant was in several material ways corroborated by the testimony of her two daughters above mentioned; however, these two girls both testified they did not see the gun when it fired, as their mother and deceased were in another room.

■ The foregoing evidence was without dispute, and at the conclusion of the evidence for the state, the appellant made motion to exclude the testimony and discharge the defendant; insisting in this connection that the evidence showed without dispute that the defendant was in her own home, where she had the right to be, and that the testimony tending to show the killing also disclosed, under the law, that said killing was justifiable under the law of self-defense, that said defense was fully made out by the evidence upon which the state relied for a conviction. Further, that there was no semblance of testimony tending to show a motive upon the part of the' accused to take the life of the deceased, etc. The court overruled the motion to exclude the testimony and discharge the defendant, and in our opinion this ruling was without error. This view obtains for the reason that while there was no substantial conflict in the evidence, as above quoted, there was evidence adduced that search was made for the alleged knife claimed to have been in the possession of the deceased, as above quoted, and that no knife was found upon his person, or about the house where the killing occurred. Thus a conflict in the evidence on this question was engendered, and there being a conflict in the evidence, even to this extent, the court was required to and did properly submit the case to the jury for its consideration.

■■ There was error, however, in the ruling of the court in declining to let the defendant show by her witness Georgia Law Dillard that just prior to the shooting and during the difficulty that the deceased said hard words to her mother, and that he threatened her. These questions had reference to matters of the res gestæ, and were admissible for that reason, as well as under the elementary rules of evidence in a case of this character. Appellant's counsel made known to the court upon the sustaining of the objection to the question, "Did he threaten her?" that she expected to prove by said witness, if permitted to answer this question, witness would swear that Ruffin did threaten to take the life of the defendant there on that occasion. The question was not objectionable on the ground that it called for an opinion or conclusion of the witness. In Bass v. State, 219 Ala. 282, 122 So. 45, 47, the Supreme Court said: "The question called for evidence of a collective fact, whether or not his father had threatened to kill his mother, and not an opinion of the witness. If the exact language is desired, it could be ascertained on further examination."

■ Witness Flossie Smith testified: "I am a sister to Dezzie B. Dillard. She and I reside in the same house. * * * At the time the shot was fired I was about forty or fifty yards from my house. When the gun fired I struck out in a trot. I went up there. When I got there I found Murie (deceased) laying between the kitchen and the dining room. He just turned over after I got there." At this juncture defendant propounded to this witness the following question: "What was he doing or saying at the time you reached there?" The witness answered: "It was bad language." Whereupon the state objected to the question, but no grounds of objection were stated. The court sustained the objection. Counsel for defendant stated: "We direct your Honor's attention to the fact that they brought in considerable testimony relative to what happened about him right after the shot, and made known to the court that defendant proposed to show, and the witness would testify, if permitted to do so, that when she got there he was continuing cursing and was using abusive language." The court declined to allow the witness to thus testify, and defendant reserved an exception. This witness also testified, when she got there, she (defendant) was standing kind of in the door of the room and she made a statement to me how it happened. The court, however, declined to allow the witness to testify as to such statement and defendant made known to the court that she proposed to show, and that the witness would swear, if permitted to do so, that defendant then and there said: "I sent for you to come get that boy out of my house, he was after me to kill me and he wouldn't get out; I asked Melvin Newman to get him out and he begged him but he wouldn't pay no

attention to him, and I just had to do something. I just couldn't help it, I just had to do something to protect myself, he was going to kill me." And further, if permitted, the witness would swear that Ruffin was cursing and that witness said to him, "Boy don't curse so much." Also, "if you can walk get up and come on and I'll wash your face or something,"' to which he replied: "I don't want you to do a damn thing for me." Exceptions were duly reserved to the court's rulings in this connection. These exceptions present the question as to whether or not the foregoing alleged statements of the parties were of the res gestæ. If they were, evidence· of the material statements should have been allowed. The witness Flossie Smith testified, as has been stated, that she was near the house when the gun fired and that immediately she ran to the house indicating that less than a minute elapsed between the firing of the gun and her arrival at the scene.

■ On the question as to what constitutes the res gestæ, there can be no set rule. From the facts of each case the question of res gestæ must be ascertained and determined. The expression "res gestæ," as applied to crime, means the complete criminal transaction from its beginning or starting point in the act of the accused until the end is reached. As stated, what in any case constitutes the res gestæ of a crime depends wholly on the character of the crime and the circumstances of the case. Generally, the rule appears to be, in homicide cases, that all the surroundings and circumstances attending the killing, the declarations of the accused at and after the killing, and his conduct at and after the killing while at or near the scene, are admissible and form part of the res gestæ.

In Nelson v. State, 130 Ala. 83, 30 So. 728 (2d headnote), Chief Justice McClellan, for the court said: "On a trial under an indictment for murder, where a witness testified that within two minutes after the firing of the fatal shot, and while the deceased was in flight, and yet within range of the assailant's gun, and was continually within the sight and hearing of the witness, deceased came to where the witness was standing, it is competent for such witness to testify as to what the deceased said to him about the cause and particulars of the difficulty, immediately upon his coming up to him; such declarations of the

deceased being a part of the res gestæ of the shooting."

"On a trial for murder, evidence as to what witnesses overheard defendant say about the killing, when leaving the place just after the shooting, was a part of the res gestæ." Holland v. State, 162 Ala. 5, 50 So. 215, 216.

"There was no error in allowing proof of what defendant was saying, just after shooting. It was a part of the res gestæ." Reeves v. State, 201 Ala. 45, 77 So. 339, 340.

"Acts and statements of one accused of murder immediately after the killing and constituting res gestæ are admissible." Consford v. State, 15 Ala.App. 627, 74 So. 740; Id., 200 Ala. 23, 75 So. 335.

"A question, 'What was she saying after she shot?' was proper in a homicide case."' Pruitt v. State, 16 Ala.App. 322, 77 So. 916.

We are of the opinion that the court erred in the rulings complained of in this connection. Authorities, supra. We think the evidence sought came within the rule announced in the case of Fonville v. State, 91 Ala. 39, 8 So. 688, 689, to wit: "Acts and declarations, to be admitted as res gestæ, must not only be substantially contemporaneous with the main fact under consideration, but must be so closely connected with it as to illustrate its character." Also the case of Domingus v. State, 94 Ala. 9, 12, 11 So. 190, 191, where it was held: Time alone is not the sole criterion as to whether matter is admissible as part of the res gestæ, it must lead up to or be the result of the main fact, or tend to throw light upon, or give character to, the main fact, or in other words be a part of the main thing.

On cross-examination of witness Flossie Smith the state brought out the fact that upon that occasion Ruffin, deceased, had been drinking and that he was drunk.

■ The appellant insists that error prevailed in the action of the court as to the refusal of numerous written charges requested. We refrain from a detailed discussion in this connection. We have read the entire oral charge of the court which practically covers nine pages of this transcript. We regard this charge as being able, fair, and full. It correctly states every phase of the law applicable to this case. In addition to this excellent charge, the court gave, at the request of defendant,

about fifty special charges. The given charges taken in connection with the oral charge fairly and substantially covered every refused charge that properly stated the law in this case. Several of the thirty-six refused charges were abstract, hence properly refused.

The court should have granted defendant's motion for a new trial from what has been said hereinabove.

For the errors indicated, the judgment of conviction from which this appeal was taken is reversed and the cause remanded.

Reversed and remanded.

A. A. Carmichael, Atty. Gen., for the State.

Brief did not reach the Reporter.